# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                    Case No. 15-CR-0247(1) (PJS/SER)

                    Plaintiff,

v.                                                ORDER

WILLIAM JAMES DAVIS,

                    Defendant.

Kimberly A. Svendsen, Amber M. Brennan, and James S. Alexander, UNITED STATES ATTORNEY'S OFFICE, for plaintiff.

Susan E. Gaertner, GRAY PLANT MOOTY, for defendant.

For 24 years, defendant William James Davis was the chief executive officer of Community Action of Minneapolis ("CAM"), a nonprofit agency that was funded by federal and state grants and that was supposed to use its funds to help those in poverty to weatherize and heat their homes. PSR ¶¶ 8, 10-11, 33. For about eight years, Davis regularly stole from the organization that he was supposed to lead. To cite just a few of the most egregious examples of Davis's thievery: Davis ordered CAM to pay his son tens of thousands of dollars per year in salary and bonuses—and to provide his son with a car and cell phone—for a "no show" job. PSR ¶¶ 13-20. Davis used CAM funds to buy a new Chrysler 300 for himself. PSR ¶¶ 26-28. Davis falsely claimed that one of his girlfriends was his wife so that she could receive CAM-provided health insurance. PSR ¶¶ 29-30. Davis charged CAM "for flowers for girlfriends and relatives; cellphone

services for a then girlfriend; printing fees for campaign related materials for him and other[] [Democratic politicians]; golf course fees; furniture; and other miscellaneous expenses." PSR ¶ 31. Davis used CAM funds to pay for vacations with various girlfriends to places like Niagara Falls, Las Vegas, the Bahamas, the Caribbean, Arizona, and Hawaii. *See* Govt.'s Sent. Exs. 23-24, 49-51, 55-63, 90-93. And Davis falsely claimed to be working during these vacations, so that he could later cash out weeks of "unused" vacation time. PSR ¶ 25.

All in all, Davis stole hundreds of thousands of dollars from the agency that had been entrusted to his care so that he could fund his lavish lifestyle, benefit his family and friends, and wine and dine his girlfriends and cronies. Davis did so despite the fact that he was paid an exorbitant salary (for the director of a small anti-poverty agency) and given an expense account and other perks that would be envied by the CEOs of many large for-profit companies. Davis was able to steal from CAM year after year because none of CAM's employees had the courage to report his criminal acts, because CAM's board of directors was weak and compliant, and because state and local officials failed to provide effective oversight—that is, until diligent auditors employed by the State of Minnesota finally brought Davis's perfidy to light. Davis was forced to step down as CEO, and CAM was later shuttered.

Last summer, Davis pleaded guilty to sixteen counts of mail fraud, wire fraud, theft concerning programs receiving federal funds, and conspiracy to commit theft concerning programs receiving federal funds. A presentence investigation report ("PSR") was prepared to assist the Court in deciding on Davis's sentence. Davis made several objections to the PSR. Those objections were the subject of an evidentiary hearing. The Court now rules on Davis's objections as follows.

## I. LOSS AMOUNT

The PSR calculated the amount of loss resulting from Davis's crimes as $451,185.85, triggering a 12-level enhancement to Davis's offense level under § 2B1.1(b)(1)(G). PSR ¶¶ 34, 49. Davis objected, arguing that, for various reasons, the actual loss was slightly more than $250,000. ECF No. 154 at 34-37. Davis objected not because he was concerned about the 12-level enhancement, which would apply whether the PSR's position or Davis's position were adopted. (The 12-level enhancement applies when the amount of loss is more than $250,000 but not more than $550,000. *See* U.S.S.G. § 2B1.1(b)(1).) Rather, Davis was concerned about the amount of restitution that he would be ordered to pay.

At the conclusion of the evidentiary hearing, the Court informed the parties of how it was likely to rule on their disputes regarding the calculation of the amount of loss—and, with that guidance, the parties were later able to agree on an amount of loss

of $387,063.67.  ECF Nos. 167, 184.  The Court thanks the parties for their efforts to reach

an agreement and finds that the amount of loss—and the amount of Davis's restitution

obligation—is $387,063.67.

## II.  SUBSTANTIAL FINANCIAL HARDSHIP

Davis also objects to ¶ 50 of the PSR.  That paragraph applies an enhancement

under § 2B1.1(b)(2)(A)(iii), based on the finding that Davis's offenses "resulted in

substantial financial hardship to one or more victims."  *See* PSR ¶ 50.  The Court

sustains Davis's objection for two reasons:

First, applying this enhancement would violate the Ex Post Facto Clause of the

United States Constitution.  Normally, the Court must apply the latest version of the

Guidelines when sentencing a defendant.  If, however, applying the latest version of the

Guidelines results in "a higher sentencing range than the Guidelines in effect at the time

of the [defendant's] offense," *United States v. Iceman*, 821 F.3d 979, 984 (8th Cir. 2016),

the Court must "use the Guidelines Manual in effect on the date that the offense of

conviction was committed," U.S.S.G. § 1B1.11(b)(1).

The indictment charges Davis with defrauding CAM "until in or about October

2014."  ECF No. 1 ¶ 9.  To be precise, Davis was forced to step down as CAM's CEO on

October 13, 2014, and nothing in the record suggests that he continued to defraud CAM

after that date.  PSR ¶ 33.  The Guidelines in effect in October 2014 did not contain an

enhancement for causing substantial financial hardship; that enhancement first appeared in the version of the Guidelines that took effect on November 1, 2015. *Compare* 2014 U.S.S.G. § 2B1.1(b)(2)(A) (providing for a two-level enhancement if the offense "(i) involved 10 or more victims; or (ii) was committed through mass-marketing"), *with* 2015 U.S.S.G. § 2B1.1(b)(2)(A) (providing for a two-level enhancement if the offense "(i) involved 10 or more victims; (ii) was committed through mass-marketing; or (iii) resulted in substantial financial hardship to one or more victims"). Therefore, the Court cannot apply this enhancement to Davis.

There is a second problem with applying this enhancement. The government argues that CAM suffered "substantial financial hardship" when it went into receivership. *Cf.* U.S.S.G. § 2B1.1, app. n.4(F)(i)-(ii) (listing insolvency and bankruptcy as two possible indicators of substantial financial hardship). But even if the government is correct, the government has not proven that CAM's receivership "resulted" from Davis's offenses, as § 2B1.1(b)(2)(A)(iii) requires.

The money stolen by Davis represented only a small fraction of CAM's annual budget. Davis stole roughly $350,000 from CAM over roughly a seven- or eight-year period. *See* ECF No. 184. That averages out to less than $50,000 per year. At the same time, CAM's annual operating budget amounted to millions of dollars. For example, CAM's annual revenue ranged from $6.8 million to $17.3 million during the period

from 2008 through 2013.  *See* Def.'s Sent. Exs. 1A to 1F.  CAM also ended most fiscal

years with a surplus.  *See id.*  For example, in fiscal year 2011, CAM received $232,440

more than it spent, leaving it with $1,380,599 in net assets.  *See* Def.'s Sent. Ex. 1D.

Davis stole a lot of money, but his thievery was not the *direct* cause of the failure of

CAM.

The government does not really disagree, but argues that Davis's criminal

behavior *indirectly* caused CAM to fail.  The government points out that, after Davis's

fraud was discovered, two state agencies stopped funding CAM.  That caused CAM to

lose millions of dollars in grant money, and the loss of that grant money forced CAM to

cease operations.  ECF No. 157 at 14-15.

The evidence supporting the government's argument is thin, however.  The

government can only point to hearsay evidence that a state official "told the

government that the [Minnesota Department of Commerce] withdrew CAM's funding

because 'it became apparent that Davis was breaking the law.'"  *Id.* at 15.  But the State

of Minnesota withdrew its funding of CAM after an audit discovered *numerous*

problems with CAM's operations—problems that, taken together, dwarfed the impact

of Davis's fraud.  *See* ECF No. 154-1 at 16-32.  For example, the audit took issue with

CAM's lack of board oversight, *id.* at 21-22, its excessive administrative costs, *id.*

at 22-24, and its poor program outcomes, *id.* at 28-29.  True, the audit referred to Davis's

improper use of CAM funds for personal expenses, but only in a single sentence in the 12-page report. *See id.* at 26. Another paragraph of the report expressed concern about "undocumented or unallowable activities reimbursed to board members and senior management," but these expenses involved CAM's board of directors and were charged to the "board allowance account." *See id.* at 27.

In sum, the Court sustains Davis's objection to application of the substantial-financial-hardship enhancement for two reasons: First, applying the enhancement would violate the Ex Post Facto Clause. And second, the government has failed to prove, by a preponderance of the evidence, that CAM lost its grant revenue because of Davis's criminal acts.

## III. AGGRAVATING ROLE

Davis also objects to the PSR's application of an aggravating-role enhancement under § 3B1.1(c). *See* PSR ¶ 53. This enhancement applies if the defendant acted as the "organizer, leader, manager, or supervisor" of "criminal activity" involving at least one other person who is "criminally responsible for the commission of the offense." U.S.S.G. § 3B1.1(c) & app. n.1. For the reasons explained on the record at the evidentiary hearing—and briefly summarized below—the Court overrules Davis's objection.

Davis pleaded guilty to—and his son Jordan was convicted of—conspiring with each other to commit a federal crime (namely, theft from a program receiving federal funds). Obviously, then, Davis was convicted of "criminal activity" that involved at least one other person (Jordan), and obviously Jordan was "criminally responsible for the commission of the offense."

Just as obviously, Davis was the "organizer" and the "leader" of this "criminal activity." Davis was the one who ordered CAM to continue paying Jordan a full-time salary (with perks such as a car and cell phone) after Jordan stopped working for a CAM affiliate and started working full-time as a Minneapolis police officer. And Davis did not simply put this scheme into motion and then walk away. Instead, when Jordan did not receive a paycheck in 2008, it was Davis, not Jordan, who contacted CAM's fiscal staff and ordered them to cut the check to his son. PSR ¶ 14. And it was Davis, not Jordan, who ordered CAM's chief financial officer to pay Jordan a "bonus" in 2010. PSR ¶ 15. In comparison, Jordan's involvement in the conspiracy was largely limited to cashing the illicit paychecks that he received every two weeks.

For these reasons, the Court overrules Davis's objection to the PSR's application of an aggravating-role enhancement under § 3B1.1(c).

## IV.  PUBLIC TRUST

Davis also objects to the PSR's application of an abuse-of-trust enhancement under § 3B1.3.  *See* PSR ¶ 54.  The Court overrules this objection for the reasons stated on the record at the evidentiary hearing.  As CEO of CAM, Davis was in a position of public or private trust, and Davis used his authority as CEO of CAM to bully his subordinates into facilitating and keeping quiet about his fraudulent acts.  Without that authority, there would have been no bullying, and without that bullying, Davis would not have gotten away with hundreds of individual acts of fraud over a period of at least seven years.  *See, e.g.*, Govt.'s Sent. Exs. 137-139, 141-146 (documenting how Davis disciplined and interacted with subordinates who displeased him).  Therefore, the Court finds that Davis "abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense."  U.S.S.G. § 3B1.3.

## V.  OBSTRUCTION OF JUSTICE

Finally, Davis objects to the PSR's application of an obstruction-of-justice enhancement under  § 3C1.1.  *See* PSR ¶ 55.  The Court sustains the objection.

An obstruction-of-justice enhancement applies if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction."  U.S.S.G. § 3C1.1.  This enhancement might apply, for example, if a

defendant backdated checks to throw off an ongoing investigation, *United States v. Martin*, 369 F.3d 1046, 1054-55, 1060-61 (8th Cir. 2004), or if a defendant "produced two forged facsimile documents purporting to be invoices . . . from" a defunct company "to evade the IRS's reporting requirements," *United States v. Waldner*, 580 F.3d 699, 708 (8th Cir. 2009). Making a false but unsworn statement to a law-enforcement officer does not, however, trigger an obstruction-of-justice enhancement, *see* U.S.S.G. § 3C1.1, app. n.5(B), unless the false statement significantly hinders the government's prosecution of the case, *see United States v. Williams*, 288 F.3d 1079, 1080-81 (8th Cir. 2002). The burden of proof is on the government to demonstrate that the defendant's lies significantly hindered its efforts to prosecute the case. *United States v. Bledsoe*, 445 F.3d 1069, 1072 (8th Cir. 2006).

Here, in arguing for application of an obstruction-of-justice enhancement, the government relies heavily on a letter that Davis sent to the Minnesota Department of Human Services ("DHS") on June 2, 2014. In that letter, Davis claimed that a draft report of a DHS audit contained "several glaring misrepresentations of the facts." ECF No. 154-1 at 34. By way of example, Davis took issue with the report's characterization of his trip to the Bahamas, claiming that he was "required" to attend that conference "as part of [CAM's] agreement with Ben & Jerry's." *Id.* at 35. This was a lie. Not only was

Davis not "required" to attend the conference, Davis was able to attend this conference only because he managed to finagle an invitation from a Ben & Jerry's franchisee.

That said, the false statements made in the letter were not given under oath. The letter was not sent to a law-enforcement officer. And there is no reason to think that the letter hindered the government's prosecution of Davis. To the contrary, Davis's letter seems to have had no impact on the state's investigation of CAM's operations, as the state refused to "remove or further modify" its findings after receiving Davis's letter. *Id.* at 16.

The non-binding authority that the government cites in support of its request for application of an obstruction-of-justice enhancement can be distinguished. One of these cases involved outright perjury. *See United States v. Fiore*, 381 F.3d 89, 91 (2d Cir. 2004). And the other four cases involved falsified documents. In *United States v. Yip*, 592 F.3d 1035 (9th Cir. 2010), the defendant provided "four false promissory notes and a false bank deposit analysis" to an IRS agent in the course of an IRS audit. *Id.* at 1041. In *United States v. Luca*, 183 F.3d 1018 (9th Cir. 1999), the defendant "intentionally submitted false prospectuses in response to an investigative subpoena issued by" a state agency. *Id.* at 1022. In *United States v. McGovern*, 329 F.3d 247 (1st Cir. 2003), the defendant "falsified run sheets" to defraud Medicare and Medicaid. *Id.* at 249. And in *United States v. Hogeland*, No. 10-CR-0061, 2012 WL 4868904 (D. Minn. Oct. 15, 2012), the

defendant "knowingly caused false documents (including a false Form 1099) to be created and filed." *Id.* at *7.

Here, Davis neither lied under oath nor forged any documents. He lied to DHS, but his dishonesty had no discernable impact on the efforts to prosecute him. Therefore, the Court sustains Davis's objection to the PSR's application of an obstruction-of-justice enhancement under § 3C1.1.

## VI.  OTHER OBJECTIONS

The remainder of Davis's objections relate to specific factual assertions in the PSR. *See* ECF No. 154 at 14-17. Davis's objections to ¶¶ 17, 23, 25, 28, 31, and 49 are moot in light of the parties' stipulation that the amount of loss (and restitution amount) is $387,063.67. And the Court does not need to rule on Davis's objections to various statements in ¶¶ 14, 19, and 22, because those statements will not affect sentencing. Fed. R. Crim. P. 32(i)(3)(B).

## VII.  SUMMARY

Based on the foregoing, and on all of the files, records, and proceedings herein, the Court makes the following rulings on Davis's objections:

1. The Court SUSTAINS IN PART Davis's objection to the amount of loss and, consistent with the parties' stipulation, finds that the amount of loss (and amount of restitution owed) is $387,063.67.

2.  The Court SUSTAINS Davis's objection to the application of a two-level substantial-financial-hardship enhancement under § 2B1.1(b)(2)(A)(iii).

3.  The Court OVERRULES Davis's objection to the application of a two-level aggravating-role enhancement under § 3B1.1(c).

4.  The Court OVERRULES Davis's objection to the application of a two-level abuse-of-trust enhancement under § 3B1.3.

5.  The Court SUSTAINS Davis's objection to the application of a two-level obstruction-of-justice enhancement under § 3C1.1.

Based on these rulings, the Court finds that Davis's offense level is 21, his criminal-history category is I, and his Guidelines range is 37-46 months.

The Court ORDERS that the PSR be amended to reflect these rulings.

Dated:  April 21, 2017                    s/Patrick J. Schiltz
                                          Patrick J. Schiltz
                                          United States District Judge